UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

LIBERTY BRIDGE CAPITAL MANAGEMENT, GP, LLC,
et al.,

                                        Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KENNETH P. SILVERMAN, Chapter 7 Trustee
of LIBERTY BRIDGE CAPITAL MANAGEMENT,
GP, LLC, et al,

                        Plaintiff-Appellant,

        -against-                                    24-cv-08062  (LAK)

                                        [No. 20-B-10009 (JPM)]
                                        [Adv. Proc. No. 20-1190 (JPM)]

CAROB BEAN REALTY CORP. II,

                        Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/24/25

                Appearances:


                        Anthony C. Acampora
                        RIMON, P.C.
                        *Attorneys for Plaintiff-Appellant*


                        Alexander Tiktin
                        David Henry Wander
                        TARTER, KRINSKY & DROGAN, LLP
                        *Attorneys for Defendant-Appellee*


                        **MEMORANDUM OPINION**


LEWIS A. KAPLAN, *District Judge.*

                This case presents the questions (1) whether the Bankruptcy Court properly pierced

2

the corporate veil between a company and a special purpose vehicle ("SPV") formed to acquire and hold title to real estate intended for use by that company, which thereby defeated an otherwise arguably valid fraudulent conveyance claim and, if so, (2) whether it properly concluded as a matter of law that the defendant gave fair consideration for the challenged transfer. Given the common use of SPVs, especially but not only in structured financing, the decision below, if correct, would threaten to have far reaching implications.

## *Facts*

*The Real Estate Contract*

Jaeson Birnbaum was the sole owner of a group of affiliated entities referred to collectively as "Cash4Cases" that engaged in the business of funding non-recourse, pre-settlement litigation advances to personal injury plaintiffs. Confusingly, the term "Cash4Cases" was the name also of a New Jersey corporation of which Birnbaum also was the sole shareholder.[1] In order to avoid confusion, the Court uses "C4C" to refer only to the New Jersey corporation and "Cash4Cases" to refer to the group of Birnbaum entities involved in the litigation funding operation.[2]

This case concerns a four-story brownstone in Murray Hill, Manhattan (the "Premises"), owned at least as early as 2018 by defendant Carob Bean Realty Corp. II ("Carob Bean"). There had been a variance in place for some time that permitted use of the Premises as an

---

[1]

In re Liberty Bridge Cap. Mgmt. GP, LLC, 663 B.R. 409, 416 (Bankr. S.D.N.Y. 2024) (hereinafter cited as *Liberty Bridge*).

[2]

C4C presumably was among the Birnbaum entities involved in the Cash4Cases litigation funding operation, but nothing turns on this.

office.  That variance, however, had expired and Carob Bean, apparently with a view to selling the property, "began working on obtaining a new variance for the" Premises at least as early as September 2018.[3]

In early 2019, Birnbaum created Liberty Bridge Properties Capital Management GP, LLC ("LBP"), the SPV, to purchase the Premises from Carob Bean.  Birnbaum intended to use the property as an office for Cash4Cases[4] and, at least presumably, to shield the Premises from claims of Cash4Cases' creditors.

On March 6, 2019, C4C wired $280,000 to Carob Bean's attorneys as the down payment on the anticipated contract of sale,[5] which apparently had not yet been signed and, in any case and according to its terms, was effective only as of March 8, 2019.[6]  Whenever executed, the signed contract provided for Carob Bean to sell and for LBP to purchase the Premises for $2,800,000.[7]  Paragraph 8 of the rider to the contract of sale stated in relevant part:

---

[3]  McCarthy Decl., *In re Liberty Bridge Cap. Mgmt. GP, LLC*, Adv. Proc. No. 20-1190, Dkt. 35, ¶¶ 3-4 (Bankr. S.D.N.Y. filed Feb. 9, 2024).  Ms. McCarthy was executive assistant to the Carob Bean's principal and was involved in hiring and reviewing invoices of professionals involved in securing the variance.

[4]  LBP never had any bank account, funds or other assets of its own, *Liberty Bridge,* 663 B.R. at 416 n.4, and, when the petition was filed, listed no liabilities, *In re Liberty Bridge Cap. Mgmt. GP, LLC*, Case No. 20-10009, Dkt 3, at 8 of 48, (Bankr. S.D.N.Y. filed Jan. 3, 2020).

[5]  A0246 at ¶ 15.

[6]  A0245 at ¶ 12.

[7]  *See id.*; A0178.

The contract required LBP to make a down payment of $280,000, which C4C in fact had wired two days earlier.  C4C, however, was not a party to the contract.  *Id*.

4

> "Seller [Carob Bean] has applied for a variance for use of the Premises as offices (the 'Variance') and the Closing will be held on or before seven (7) days from receipt of the Variance, with TIME BEING OF THE ESSENCE."[8]

Thus, the contract did not oblige Carob Bean to apply for the variance – indeed, it already had done so.[9]  Nor did it oblige Carob Bean even to pursue the variance.[10]  Rather, as Carob Bean conceded on oral argument in this Court, receipt of the variance was a waivable condition of the purchaser's obligation to close.[11]  Moreover, the contract was expressly assignable (or "flippable") with the seller's consent.[12]  So while Birnbaum intended to use the Premises to house an office for Cash4Cases, LBP certainly could have elected to close or, with the seller's consent, to assign ("flip"

---

[8]

A0185.

[9]

The court below stated that "Defendant subsequently [i.e., after May 6, 2019] applied for . . . the zoning variance." *Liberty Bridge,* 633  B.R. at 417 (citing defendant's counter-statement in opposition to plaintiff's motion for summary judgment).  That statement is inconsistent with the language of the contract rider, which stated as of March 8, 2019 that Carob Bean "has applied for . . . the 'Variance.'" A0185.  Nor is the statement supported by the defendant's counter-statement.  While the record does not disclose when the formal application for the zoning variance was filed with New York City authorities, Ms. McCarthy's declaration makes clear that the work to obtain a new variance began no later than September 2018.  McCarthy Decl., Adv. Proc. Dkt. 35, ¶¶ 3-4.  ("Adv. Proc. Dkt" henceforth refers to the docket sheet for *In re Liberty Bridge Cap. Mgmt. GP, LLC*, Adv. Proc. No. 20-1190).

[10]

The court below stated at least twice, in words or in substance, that "[t]he Sale Contract also obligated Defendant to acquire a zoning variance prior to the closing that would allow the premises to operate as an office." *Liberty Bridge,* 663 B.R. at 417 (citing defendant's counter-statement in opposition to plaintiff's motion for summary judgment), 425 (citing contract rider and summary thereof).  In each case, however, the court's statements, are inconsistent with the language of the contract rider and other cited documents, which in relevant part accurately reflected the fact that the receipt of the variance was merely a condition of LBP's obligation to close.  Adv. Proc. Dkt. 39, ¶ 10.

[11]

Tr., Mar. 11, 2025, at 21:14-22:6 ("Mr. Titkin:  The conditions could have been waived.").

[12]

Adv. Proc. Dkt. 28-3, ¶ 26.

5

in the vernacular) the purchase contract without the variance having been obtained.

In May 2019, LBP received a mortgage commitment letter that identified LBP as the borrower and C4C and Birnbaum as primary obligors.[13]   The zoning variance was issued on or about October 22, 2019.[14]   Nevertheless, LBP and Birnbaum ultimately failed to fund the purchase and the transaction never was completed.[15]   Carob Bean retained the $280,000 down payment and ultimately sold the Premises to a third party for $650,000 less than the purchase price contemplated by the contract with LBP.[16]

*The Bankruptcy and Related Matters*

In January 2020, the debtors – eight entities associated with Birnbaum's litigation funding business[17] – filed voluntary petitions for relief under chapter 7 of the United States

---

[13]

A0193. Jason Birnbaum and Cash4Cases, Inc. are described as both "guarantors" and "primary obligors." *Id.*

[14]

A0247 at ¶ 16.

[15]

*Id.* at ¶ 19.

[16]

*Id.* at ¶ 20; A0254 at ¶ 64.

[17]

The debtors are: (i) Liberty Bridge Capital Management GP, LLC; (ii) C4C; (iii) Liberty Bridge Capital Management IM, LLC; (iv) Liberty Bridge Settlement Clearing, LLC; (v) Liberty Bridge Finco LLC; (vi) Liberty Bridge Capital Management, L.P.; (vii) Diversified Pre-Settlement Portfolio I, a Series of Liberty Bridge Capital Management, L.P.; and (viii) Diversified Pre Settlement Portfolio II, a Series of Liberty Bridge Capital Management, L.P.

The estates were substantively consolidated.  A0243 at ¶ 4.

Bankruptcy Code.[18]  Birnbaum later pled guilty to securities fraud related to his litigation funding business.[19]

In June 2020, the Trustee commenced this adversary proceeding against Carob Bean[20] to recover the $280,000 down payment as a fraudulent conveyance voidable under Sections 273–76 of the New York Debtor and Creditor Law ("DCL")[21] and Section 548 of the Bankruptcy Code.[22] The parties cross-moved for summary judgment.  The Bankruptcy Court denied the Trustee's motion and granted Carob Bean's cross-motion for summary judgment dismissing the Trustee's complaint.[23]

The Bankruptcy Court's rationale was this:

1.    LBP and C4C were *alter egos*, principally because "LBP had no separate existence . . . [and] LBP's sole [ ] purpose [was] to hold property where [Cash4Cases] would operate its business."[24]

2.    Because C4C and LBP were *alter egos*, "any benefit to LBP was necessarily

---

18

A0243.

19

A0248-A0249.

20

The Trustee's complaint named LBP as a defendant as well.  But neither LBP nor its sole shareholder, Birnbaum, participated in the adversary proceeding.  The Bankruptcy Court therefore treated Carob Bean as the sole defendant. *Liberty Bridge*, 663 B.R. at 415 n.3.

21

The down payment at issue occurred prior to the 2020 revisions to the DCL. Therefore, the DCL in effect as of March 6, 2019, the date of the down payment, is applicable.

22

*Id*. at 417-18.

23

*Id*. at 432.

24

*Liberty Bridge,* 663 B.R. at 420 (quoting and expressing agreement with defendant's position) (bracketed material and bracketed omissions in court's decision).

7

a benefit to [C4C]."[25]  Accordingly, LBP's contractual right to close on the purchase contract was

consideration to C4C for the down payment.[26]  "[G]iven the relative parity between the [down

payment made by C4C] and the costs incurred by [Carob Bean] in acquiring the variance," C4C

received fair consideration under the DCL and reasonably equivalent value under the Bankruptcy

Code.[27]  In addition, the purchase contract that LBP secured indirectly benefitted C4C, which gained

"the ability to acquire a new place of business" in the event the sale of the Premises closed.[28]  The

consideration in either case was "fair."

   3. Accordingly, the Trustee cannot recover under the constructive fraud

provisions of (a)  the DCL, Sections 273-75, or (b)  Section 548(a)(1)(B) of the Bankruptcy Code.

   4. Nor may the Trustee recover under the Code's actual fraud provision, Section

548(a)(1)(A), or the DCL's actual fraud provision, DCL Section 276.  Given Carob Bean's good

faith and the fair consideration provided, Carob Bean was entitled to the affirmative defenses under

Section 548(c) of the Bankruptcy Code and Section 278, subd. 1, of the DCL.

   The Trustee contends that the court below erred in several respects. First, the Trustee

argues that the Bankruptcy Court's conclusion that LBP and C4C were *alter egos* was incorrect

---

[25]

  *Liberty Bridge*, 663 B.R. at 425 n.13.

[26]

  *Id.*

[27]

  *Liberty Bridge*, 663 B.R. at 425-426.

[28]

  *Liberty Bridge*, 663 B.R. at 425 n.13.

  It is not entirely clear whether the Bankruptcy Court concluded that, even in the absence of
its conclusion that C4C and LBP were *alter egos*, this indirect benefit to C4C would have
been fair consideration.  The court's discussion in footnote 13 appears to suggest that there
is an independent basis for finding fair consideration under the *Rubin* doctrine.

8

because "the *alter ego* doctrine is not intended to be used defensively by any party but rather only as a means to impose liability on a shareholder for corporate debt."[29]  The *alter ego* doctrine, the Trustee argues, is "a sword wielded to prevent a corporation that has acted unjustly in protecting itself from liability," rather than "a shield, intended to avoid liability."[30]  Accordingly, defensive use of the *alter ego* doctrine is inappropriate and "unprecedented."[31]  Second, the Trustee argues that, even if C4C and LBP were *alter egos*, the variance did not constitute consideration to either entity.[32] Because the sale never was consummated, LBP and C4C never enjoyed the benefit of the variance, which runs with the land.[33]

It is unnecessary to rule on the Trustee's arguments in their entirety.  This dispute is best resolved on narrower grounds.

---

[29]

Dkt 6 (Appellant's Opening Brief) at 7.

Carob Bean argues that the Trustee waived its argument that the *alter ego* doctrine cannot be applied defensively because it was raised for the first time on appeal.  *See* Dkt 8 at 13-14. The Court agrees that this issue was not raised by the Trustee below.  Although "it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal," *see Greene v. United States*, 13 F.3d 577, 586 (2d Cir.1994), this rule is prudential, and a court may entertain new arguments on appeal "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding."  *See Bogle–Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006).  As Carob Bean acknowledges, the Trustee's argument regarding the *alter ego* doctrine is a question of law.  *See* Dkt 8 at 20 (describing Appellant's argument regarding the limits on defensive use of *alter ego* doctrine as a "legal issue").  Therefore, the Court finds that it is appropriate to consider this issue on appeal.

[30]

Dkt 6 at 16.

[31]

*Id*. at 7-8.

[32]

*Id.* at 8.

[33]

*Id*.

First, the *alter ego* doctrine may not be deployed, as the court below mistakenly did here, solely on the basis of domination and control. Under New York law, the *alter ego* doctrine requires proof not only that one entity dominated and controlled another but also, critically, that this domination and control was used to defraud or otherwise abuse the party seeking to invoke the doctrine. The court below overlooked the latter requirement. The injury requirement is important because, if domination alone were sufficient, it would permit a party to apply the doctrine to many SPVs in the absence of causally related injury, which would undermine the permitted use of the corporate form to limit liability. Thus, even assuming, as the court below concluded, that the *alter ego* doctrine may be used defensively in an appropriate case, this was not such an instance because the separate legal existences of LBP and C4C were not used to defraud or otherwise injure Carob Bean. Accordingly, the conclusion that LBP and C4C were *alter egos* was inappropriate under New York law.

Second, the Bankruptcy Court's conclusion that C4C received fair consideration for the $280,000 down payment – and consequently that the Trustee could not recover on its constructive fraud claims, of which the absence of fair consideration is a required element – rested principally, though not exclusively, on the premise that C4C and LBP were *alter egos*. Nevertheless, the decision below is susceptible also to a reading that, under the doctrine outlined by the Second Circuit in *Rubin v. Manufacturers Hanover Trust Co.*,[34] C4C enjoyed an indirect benefit sufficient to constitute fair consideration, which is not predicated on the premise that C4C and LBP were *alter egos*. As further discussed below, however, the decision below cannot stand on that basis alone, as

---

[34] 661 F.2d 979, 991–92 (2d Cir. 1981).

there is a genuine issue of material fact as to whether this indirect benefit to C4C constituted fair consideration.[35]

Third, the court below erred also when it concluded that the affirmative defenses of Sections 278(1) of the DCL and 548 of the Bankruptcy Code barred the Trustee's actual fraud claims. Section 278(1) of the DCL requires a finding of fair consideration.[36] Because there is a genuine issue of material fact as to whether C4C received fair consideration for the transfer, Carob Bean is not entitled to this affirmative defense as a matter of law. With respect to the affirmative defense under Section 548(c) of the Bankruptcy Code, Carob Bean is protected only to the extent of the "value" that it gave in return for the allegedly fraudulent transfer, in this case the deposit paid to Carob Bean. The determination of the extent of any such "value" therefore requires separate analysis. Thus, the court below was mistaken in dismissing the Trustee's actual fraud claim under Section 548 of the Bankruptcy Code because it failed properly to determine the "value," if any, that Carob Bean actually provided in exchange for the down payment.

### Discussion

*Relevant Summary Judgment Standards*

---

[35]

The analysis for reasonably equivalent value under Section 548 of the Bankruptcy Court is the same. "Fair consideration" under the DCL and "reasonably equivalent value" under the Bankruptcy Code are functionally equivalent, apart from the DCL requirement of good faith. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995); *see also In re TS Emp., Inc.*, 597 B.R. 494, 524 (Bankr. S.D.N.Y. 2019).

[36]

*Fed. Deposit Ins. Co. v. Malin*, 802 F.2d 12, 18 (2d Cir. 1986) (noting that Section 278(1) requires that the transferee be a purchaser for fair consideration without knowledge of the fraud at the time of the purchase).

"Summary judgment should be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A genuine dispute as to a material fact exists and summary judgment is therefore improper where the evidence is such that a reasonable jury could decide in the non-movant's favor."[37]

The fact that summary judgment is available only when there is no genuine issue as to any material fact has significant implications both for a motion court's assessment of such a motion and for an appellate tribunal's review of its motion decisions. The motion court's task is only to determine whether genuine issues of material fact exist, not to decide them. And appellate review of its determinations is *de novo* – it is to determine whether the moving party is entitled to relief either on the basis of undisputed facts or on the assumption that all factual disputes are resolves for purposes of the motion in favor of the non-moving party. Moreover, where, as here, "parties cross-move for summary judgment, . . . each motion is analyzed separately, in each case construing the evidence in the light most favorable to the non-moving party. [T]he fact that both sides have moved for summary judgment does not mean that the court' is required to enter judgment for one side or the other."[38]

*The* Alter Ego *Doctrine*

The motion court's determination that LBP and C4C were *alter ego*s is pivotal to the decision below, and it is important to focus on the reason that is so.

The alleged fraudulent conveyance here was C4C's $280,000 payment to Carob Bean

---

[37]
Ezrason's, Inc. v. Travelers Indem. Co., 89 F.4th 388, 394 (2d Cir. 2023) (internal quotation marks and citations omitted).

[38]
*Id.* (internal quotation marks and citations omitted).

as the deposit on the purchase contract.  It is undisputed that C4C was insolvent when it made that payment.[39]  DCL Section 273 provides in relevant part that "[e]very conveyance made . . . by a person who is . . . insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance . . . is made . . . without a fair consideration."[40]  But C4C had no legal interest in the purchase contract, and it received no money and nothing tangible in return for the payment.  So what consideration, if any, let alone fair consideration, did C4C receive for its $280,000 down payment?

The motion court concluded that C4C received fair consideration because (1) "the $280,000 Down Payment provided LBP – an affiliate and *alter ego* of Cash4Cases – . . . the right to close on the Premises, i.e., the right to purchase real property intended to benefit Cash4Cases and its other affiliates" and (2) there was "relative parity between the Down Payment and the costs incurred by Defendant in acquiring the variance."[41]    Thus, its dismissal of the constructive fraudulent conveyance claims depended,

*First,*  on the premise that it was appropriate to pierce the corporate veil between LBP and C4C and thus to impute to C4C consideration received by LBP and

*Second*, assuming the validity of that premise, finding "relative parity"  between the

---

[39]

     Def. Counter-Statement of Undisputed Facts, Adv. Proc. Dkt. 33, ¶ 24 (undisputed that "[a]t the time of the Transfer, Cash4Cases was insolvent because Cash4Cases' liabilities exceeded its assets.").

[40]

     DCL § 273 (2019).  Constructive fraud claims under the Bankruptcy Code require proof of "less than a reasonably equivalent value in exchange" for the transfer. 11 U.S.C.A. § 548(a)(1)(B)(i). "Reasonably equivalent value" has the same fundamental meaning as "fair consideration" under the DCL, apart from the DCL requirement of good faith.  *See Liberty Bridge*, 663 B.R. at 430.  Thus, this discussion applies also to the Trustee's constructive fraud claims under the Bankruptcy Code.

[41]

     *Liberty Bridge,* 663 B.R. at 425-26 (emphasis added).

approximately $228,000 spent by Carob Bean in pursuing the variance between the fall of 2018 (before there is any evidence that Birnbaum and his entities appeared on the scene) and October 2019.

The Trustee challenges both the premise and the relative parity finding, the former on the basis that the *alter ego* doctrine never can be applied defensively, as the motion court did here, and the latter because the benefit of the variance remained with the property and ultimately never was enjoyed by LBP or C4C due to the failure to close the sale. As previously indicated, this Court need not decide whether defensive use of the *alter ego* doctrine always is prohibited because the premise, in its view, plainly was incorrect on this record even if defensive use of the *alter ego* doctrine might be permissible on a different record.

We start from the fundamental principle that disregard of the corporate form is disfavored under New York law.[42] Piercing the corporate veil – and thus disregard of corporate separateness – is an exceptional remedy "to prevent fraud or to achieve equity."[43] It is appropriate only where, at the time of the transaction: (1) a dominant shareholder or corporation exercised such control that the dominated entity was a "mere instrumentality"; (2) "such control [was] used to commit fraud or other wrong"; and (3) "the fraud or wrong [resulted] in an unjust loss or injury to plaintiff."[44] The same principles apply where the theory for disregarding corporate separateness is

---

[42]    See *Cobalt Partners, L.P. v. GSC Cap. Corp.*, 97 A.D.3d 35, 40 (1st Dep't 2012).

[43]    See *Int'l Aircraft Trading Co. v. Manufacturers Tr. Co.*, 297 N.Y. 285, 292 (1948).

[44]    See *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc*., 933 F.2d 131, 138 (2d Cir. 1991) (citing *Lowendahl v. Baltimore & O.R. Co.*, 247 A.D. 144, 157 (1st Dep't 1936), *aff'd*, 272 N.Y. 360 (1936)); *Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141 (1993) ("[P]iercing the corporate veil requires a showing that: (1) the owners

characterized as *alter ego* liability.[45]  "Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation [or shareholder] that *leads to a wrong against third parties*."[46]  Indeed, the New York Court of Appeals repeatedly has emphasized that domination alone is insufficient to pierce the corporate veil:

> "While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required. *The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.*"[47]

---

exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.").

[45]

See *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc*., 933 F.2d 131, 138 (2d Cir. 1991) ("[T]he three-factor rule in New York and the *alter ego* theory [. . .] are indistinguishable, do not lead to different results, and should be treated as interchangeable."); *see also Garmendia v. Bd. of Managers of 255 Cabrini Blvd. Condo. Ass'n*, No. 15-CV-1734 (CM), 2016 WL 751015, at *4 (S.D.N.Y. Feb. 24, 2016) ("The test for *alter ego* liability—where it is alleged that two defendants are essentially one in the same—is the same as for piercing the corporate veil.").

[46]

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) (emphasis added).

[47]

*Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141–42 (1993) (internal citations omitted); *see also Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d at 138 (under New York law, "[c]ontrol must be used to commit a fraud or other wrong that causes plaintiff's loss" in order to pierce the corporate veil); *see also Elec. Switching Indus., Inc. v. Faradyne Elecs. Corp*., 833 F.2d 418, 424 (2d Cir. 1987) (explaining that in order to pierce the corporate veil, New York law requires a showing that "control and domination was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of").

In this case, the motion court paid close attention to the issue of domination and control.  It carefully analyzed the factors outlined in *Passalacqua*,[48] which supported its doubtlessly correct conclusion that LBP was dominated.  But the court below utterly and erroneously ignored the requirement that the domination and control must have defrauded or abused Carob Bean to its injury – in other words, that C4C not only dominated LBP, but also "abused the privilege of doing business in the corporate form *to perpetrate a wrong or injustice against"* Carob Bean.[49]  Indeed, even viewing the record in the light most favorable to Carob Bean, there was no evidence to support such a view.  What happened here was only that Carob Bean took a wire transfer for the deposit from an entity that, so far as the record shows, was a total stranger to the purchase transaction between Carob Bean and LBP.  And recognition of that fact does not suggest that there was any impropriety or neglect in Carob Bean's having done so.  Such things probably have happened tens of thousands of times.  But there was nothing fraudulent or abusive about C4C simply having made that payment.

To be sure, the opinion below suggests that the motion court assumed that proof of domination and control was sufficient to establish that C4C and LBP were *alter ego*s.  This is clear from its quotation of *Gartner v. Synder*[50] and the cases it in turn cited.  But those authorities dealt

---

[48]

       *See Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d at 139.  The *Passalaqua* factors go to the "first prong" of the three part test for piercing the corporate veil under New York law.  *See New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014).

[49]

       *Id*.

[50]

       607 F.2d 582, 586 (2d Cir. 1979).

16

with the liability of principals for the actions of their agents, a different matter.[51]  In any case, as

explained, both the Second Circuit and the New York Court of Appeals subsequently have made it

abundantly clear that domination and control is not alone sufficient to pierce the corporate veil on

an *alter ego* basis.[52]  The dominating party must also "pervert[] the protective benefits of the

corporate privilege to commit a wrong" against the party invoking the doctrine.[53]

Consequently, the Court need not decide whether defensive use of the *alter ego*

doctrine is inappropriate in every instance.[54]  Naturally, it most often will apply to "offensive" use

---

[51]

In *Berkey v. Third Avenue Railway Co.*, Judge Cardozo explained that "[d]ominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent." 244 N.Y. 84, 95 (1926).  Drawing on *Berkey*, the New York Court of Appeals explained in *Walkovszky v. Carlton*, that "[i]n determining whether liability should be extended to reach assets beyond those belonging to the corporation, we are guided, as Judge Cardozo noted, by 'general rules of agency.'" 18 N.Y.2d 414, 417 (1966).  Accordingly, "whenever anyone uses control of the corporation to further his own rather than the corporation's business, he will be liable for the corporation's acts upon the principle of *respondeat superior* applicable even where the agent is a natural person." *Id*; *see also Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 657 (1976).

[52]

Pointing to *Walkovszky,* the New York Court of Appeals in *Morris v. New York State Dep't of Tax'n & Fin.* clarified that *"*domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party invoking the doctrine] is required." 82 N.Y.2d 135, 141-142 (1993).  The Second Circuit in *Passalacqua* also made clear that "the control must be used to commit a fraud or other wrong that causes plaintiff's loss." 933 F.2d at 138.

For a review of the *alter ego* doctrine under New York law, *see* Edward P. Yankelunas, The Alter Ego Article Doctrine in New York, N.Y. St. B.J., May 2015, at *11-15.

[53]

*See Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 144 (1993).

[54]

Undoubtedly, the *alter ego* doctrine is not intended to benefit the entity or individual that abused the corporate form, and some courts have rejected defensive application of the doctrine in other contexts.  *See e.g., See United States v. Aiello*, 198 F.3d 255 (9th Cir. 1999) (noting "the equitable doctrine allowing the corporate veil to be pierced is always a sword for creditors, not a shield for the owner who has misused the corporate form," which "sometimes matters in fraud cases, because money owed to the corporation may, after

by parties seeking to impose liability because the test requires that domination cause injury to the party invoking the doctrine. However, the New York Court of Appeals has noted that "[b]ecause a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised."[55] Indeed, there are an "infinite variety of situations that might warrant disregarding the corporate form."[56]

       The veil piercing remedy requires the trier of fact ultimately to decide, considering the totality of the evidence, whether "the policy behind the presumption of corporate independence and limited shareholder liability — encouragement of business development — is outweighed by the policy justifying disregarding the corporate form — the need to protect those who deal with the corporation."[57] The court below concluded that this policy analysis weighed in favor of Carob Bean,

---

bankruptcy, go to its trustee on behalf of its creditors, while a setoff would benefit the thief rather than the creditors"); *Abbasid, Inc. v. First Nat'l Bank of Santa Fe*, 2010 WL 11509104, at *11 (D.N.M. 2010) (attempting to bind corporation to shareholder's voluntary dismissal); *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 460 (7th Cir. 1991) (parent company invoking the doctrine to benefit from subsidiary's release); *Mann v. Hanil Bank,* 920 F. Supp. 944, 952-53 (E.D. Wisc. 1996) (finding application of the *alter ego* doctrine was inappropriate, where ostensibly innocent third parties "invoked the *alter ego* doctrine as a defense to liability, not as a means for imposing liability upon a corporate entity structured for an improper purpose").

[55]    *Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d at 141.

[56]    *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d at 139.

[57]    *Id*. at 139.

as a third party that engaged in a good faith arms-length transaction with LBP.[58]  But that is beside the point.  Birnbaum appears to have created LBP to hinder the creditors of the insolvent C4C.  Here, disregarding corporate separateness would prevent the creditors of Birnbaum's corporate instrumentalities from voiding the transfer, thereby reducing *their* consolidated estates *and in effect realizing Birnbaum's improper purpose*.  Disregarding the corporate separateness of LBP and C4C, however, would not remedy any fraud or abuse perpetrated on Carob Bean by virtue of the domination of LBP.  Moreover, it bears mention that Carob Bean, though a good faith actor, had the opportunity to protect itself before accepting payment from a separate entity with whom it was not in contractual privity and of whose solvency it was in complete ignorance.[59]

*Fairness of Consideration*

The Trustee emphasizes that LBP ultimately "received nothing" because the sale of the Premises did not close.[60]  However, failure to close the sale does not negate the value of the contractual rights LBP received in exchange for the down payment.[61]  Absent the conclusion below

---

[58]

    *See Liberty Bridge*, 663 B.R. at 422-23.

[59]

    *See* Dkt 9 at 10 ("Appellee accepted a Downpayment from an entirely separate entity, Cash4Cases, that was not a party to the Contract, had no rights thereunder, that is not in the business of purchasing real estate and of whose existence Appellee had no knowledge. Appellee accepted the Downpayment from Cash4Cases at its own peril.")

[60]

    *See* Dkt 6 at 16.

[61]

    *See e.g., Matter of Wey*, 854 F.2d 196, 200 (7th Cir. 1988) (finding that forgiveness of remaining $4.6 million debt was reasonably equivalent value under § 548(a)(2) in return for $520,000 forfeited down payment); *In re Treasure Valley Opportunities, Inc.*, 166 B.R. 701, 704 (Bankr. D. Idaho 1994) (noting that "each payment toward the contract was the

19

that C4C and LBP were *alter egos*, however, C4C did not receive commensurate contractual rights. This, however, is not the end of the inquiry.

      The Bankruptcy Court, as previously noted, pointed to one basis for consideration that is not predicated on the conclusion that LBP and C4C were *alter egos* under New York law: what it described as the "clear economic (albeit indirect) benefit conveyed to [C4C] under [the] Sale Contract," namely "the ability to acquire a new place of business."[62]  But this benefit, if it may be called that, was not reflected in any contractual rights of C4C.  And it was contingent on LBP having the resources and will to close on its purchase contract and its continued intention to use the Premises for C4C's benefit.  Thus, even on the view of the court below, C4C paid $280,000 to Carob

---

purchase of an interest in the contract equal to the amount of the payment" and that this remains true despite the debtor's eventual default because "the determination of reasonably equivalent value is made as of the time each payment was made"); *In re Denison*, 292 B.R. 150, 152 (E.D. Mich. 2003) (finding a contract right to obtain title to a mobile home upon completion of an installment payment agreement constituted reasonably equivalent value); *Matter of Louisiana Pellets, Inc.*, 838 Fed. Appx. 45, 50-51 (5th Cir. 2020) (courts "do not consider the later failure or depreciation of an obligation" in the examination reasonable equivalency); *Matter of Fairchild Aircraft Corp.,* 6 F.3d 1119, 1127 (5th Cir. 1993) (economic value is "appropriately valued as of the time the investment was made").

The fact that an investment does not generate positive returns does not negate the economic value of the contractual right to potentially receive a benefit. Indeed, every investment has some risk that the desired benefit will not materialize. Otherwise, every losing investment could be characterized as lacking consideration. *See In re Chomakos*, 69 F.3d 769, 771 (6th Cir. 1995) (explaining that "the contractual right to receive payment in the event that [the bet] turns out well" has economic value); *see also In re R.M.L., Inc.,* 92 F.3d 139, 152 (3d Cir. 1996) ("[S]o long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred."); *see also Ire Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002)("[C]onsistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one [. . .]  is to be determined at the time of purchase.").

[62]    *See Liberty Bridge*, 663 B.R. at 426 n.13.

20

Bean for the chance that it might wind up with new office space.  There was no proper basis for concluding that this chance was fair consideration for the $280,000.

As a general matter, "when a debtor transfers its property but the transferee gives the consideration to a third party, the debtor ordinarily will not have received fair consideration in exchange for its property."[63]  To be sure, in some instances, an indirect benefit received from a transaction may constitute fair consideration.  The Second Circuit in *Rubin v. Manufacturers Hanover Trust Co.* stated that there may be fair consideration "if the giving of the consideration to [a] third person otherwise confers an economic benefit upon the debtor" provided that "the value of the benefit received by the debtor approximates the value of the property or obligation he has given up."[64]  The Circuit further explained:

> "In each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred. Thus, although these 'indirect benefit' cases frequently speak as though an 'identity of (economic) interest' between the debtor and the third person sufficed to establish fair consideration, *the decisions in fact turn on the statutory purpose of conserving the debtor's estate for the benefit of creditors.*"[65]

On this basis, for example, fair consideration may exist where a debtor's repayment of another entity's debt indirectly benefits the debtor because the two essentially act as a single

---

[63]

See *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995).

[64]

*Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 991–92 (2d Cir. 1981). This doctrine is also applicable to fraudulent conveyance claims under the DCL. *See HBE Leasing Corp.*, 48 F.3d at 638 ("While *Rubin* has most often been applied in cases decided under the fraudulent conveyance provisions of federal bankruptcy law, its approach to indirect benefits is equally applicable under the parallel provisions of the UFCA.").

[65]

*Rubin*, 661 F.2d at 991–92 (internal citations omitted) (emphasis added).

economic unit[66] or, in the case of a novation, where the debtor's discharge of a third person's debt likewise discharges his own debt to that person.[67]   Indirect benefits may include also "synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships."[68] In such cases, the indirect benefit received essentially offsets the cost to the debtor's estate. Although the substance of the indirect benefit may vary, the dispositive question is whether the net worth of the debtor's estate has been preserved so that the creditors' interest vis a vis the debtor has not been injured as a result of the transfer.   Accordingly, not every indirect benefit qualifies as fair consideration.

Ordinarily, "to determine whether a debtor indirectly received fair consideration under the *Rubin* doctrine, the fact-finder first must attempt to measure the economic benefit that the debtor indirectly received from the entire transaction, and then compare that benefit to the value of the property the debtor transferred."[69]   The court below did not engage in such a quantitative comparison.[70]   It simply assumed that the *possibility* that C4C would obtain a new office *if* LBP

---

[66]

 *See e.g.*, *McNellis v. Raymond*, 420 F.2d 51, 53 (2d Cir. 1970); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823 (5th Cir. 1959), cert. denied, 362 U.S. 962 (1960).

[67]

 *See Rubin*, 661 F.2d at 992.

[68]

 *See In re Nirvana Rest. Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006); *see also In re Image Worldwide, Ltd.*, 139 F.3d 574, 578–79 (7th Cir. 1998).

[69]

 *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638–39 (2d Cir. 1995).

[70]

 *See Liberty Bridge*, 663 B.R. at 426 n.13.

closed on the purchase was sufficient benefit to support the $280,000 payment.[71]

The fact that the court below did not engage in *Rubin's* quantitative approach is not the final consideration, as there are some limited circumstances in which that approach is not essential.  For example, in *HBE Leasing Corp. v. Frank*, "multiple co-defendants were threatened with joint and several liability, they mounted a common defense, and one defendant paid the legal fees of the others."[72]  Noting that individual defendants could choose to pay as much for their defense as they deemed worthwhile, provided the fees were reasonable, the Second Circuit concluded that the indirect benefit of the joint defense constituted fair consideration.[73]  "[T]o the extent that the several defense attorneys conducted a joint defense, they effectively advanced the interests of all defendants simultaneously," and "[t]hus, the services that each defense attorney performed in the course of conducting a joint defense provided a benefit to each defendant."[74]  The Circuit reasoned that "*Rubin's* quantitative approach" was "not applicable under these circumstances because the full value of the joint defense inured to the benefit of all defendants," and it therefore was unnecessary to quantify the additional value of a joint, rather than individual, defense.[75]

The facts in *HBE Leasing Corp.* were quite unlike those presented here.  Here, C4C and LBP received markedly disproportionate "benefits."  The down payment provided by C4C

---

[71]     *Id.*

[72]     *See HBE Leasing Corp. v. Frank*, 48 F.3d at 639.

[73]     *Id.*

[74]     *Id.*

[75]     *Id.*

offered C4C only the potential to occupy the Premises whereas LBP secured the more valuable legal right to close and thus compel transfer of title to the Premises.  Accordingly, *HBE Leasing* does not excuse the quantitative assessment that *Rubin* required.

As the Circuit in *Rubin* pointed out, the indirect benefit rule is rooted in the statutory purpose of "conserving the debtor's estate for the benefit of creditors."[76]  Here, Cash4Cases provided $280,000 to Carob Bean, and it arguably received an indirect benefit in exchange: potentially occupying the Premises as a tenant without securing any equity in the Premises or rights as a prospective tenant.  A genuine issue of material fact exists regarding whether C4C received "an asset or the discharge of a debt worth approximately as much as the property [it gave up]."[77]  Carob Bean therefore was not entitled to judgment as a matter of law on the Trustee's constructive fraud claims.

*Carob Bean's Affirmative Defenses under DCL Section 278(1) and Bankruptcy Code Section 548(c)*

The Bankruptcy Court granted Carob Bean's motion for summary judgment on the Trustee's actual fraud claims because it concluded that Carob Bean, as a good faith transferee for value, was entitled to summary judgment dismissing the complaint on the basis of the affirmative defenses provided by DCL Section 278(1) and Bankruptcy Code Section 548(c).

DCL Section 278(1) provides an affirmative defense to transferees who receive property for fair consideration without knowledge of the fraud at the time of the purchase.[78]  Because

---

[76]     *Rubin,* 661 F.2d at 992.

[77]     *Id*.

[78]     NY Debt & Cred L § 278 (2019); *see Fed. Deposit Ins. Co. v. Malin*, 802 F.2d 12, 18 (2d Cir. 1986).

there is a genuine issue of material fact as to whether C4C received fair consideration, Carob Bean is not entitled to the affirmative defense under DCL Section 278(1) on summary judgment.[79]

Bankruptcy Code Section 548(c), on the other hand, operates differently. It provides that "a transferee . . . of such a transfer or obligation that takes for value and in good faith . . . may retain any interest transferred or may enforce any obligation incurred, as the case may be, *to the extent that such transferee or obligee gave value* to the debtor in exchange for such transfer or obligation."[80] Because the Bankruptcy Court concluded that C4C had received reasonably equivalent value for the down payment, it did not conduct a separate analysis of "value" under Section 548(c).[81]

Even in the absence of *reasonably equivalent* value under Section 548(a)(1)(B)(i),

---

[79]

The Bankruptcy Court stated also that "the Trustee cannot recover under DCL Section 276 because there is no fraudulent intent by [Carob Bean]." *Liberty Bridge*, 663 B.R. at 432. There is a split among New York courts as to whether DCL Section 276 requires the plaintiff to prove the fraudulent intent of only the transferor or of both the transferor and transferee. A review of the case law and the text of the DCL supports the conclusion that only the fraudulent intent of the transferor must be proven under Section 276. *See In re Dreier LLP*, 452 B.R. 391, 427-36 (Bankr. S.D.N.Y. 2011) (concluding after extensive review that DCL Section 276 requires a creditor to prove the intent to defraud on the part of the transferor only). Therefore, the Trustee need not prove Carob Bean's fraudulent intent.

[80]

11 U.S.C. § 548(c) (emphasis added); *see In re Bayou Grp., LLC*, 439 B.R. 284, 308 (S.D.N.Y. 2010) *(*"After a debtor makes out a prima facie case of actual or constructive fraudulent conveyance, a transferee nevertheless may avoid rescission of a transfer under Section 548(c)[.]").

[81]

The Court finds no error in the Bankruptcy Court's conclusion that Carob Bean acted in good faith.

there may be "value" under Section 548(c).[82]  Although the Second Circuit has not spoken directly to this issue, the Fifth Circuit has concluded that a "good faith transferee is entitled to the protections of section 548(c) when it gives *any* value in return, but *only to the extent of that value*."[83]  This conclusion finds support in the text of the statute.  First, "the term 'reasonably equivalent value' appears in section 548(a)(1)(B)(i) as a factor in the determination of constructive fraudulent transfer," but "[i]t does not appear in section 548(c)."[84]  Second, "[t]he last clause of the statute, beginning with 'to the extent,' makes clear that a transferee is entitled to keep only the amount of a fraudulent transfer that equals the amount it gave up in exchange."[85]

Here, there is a genuine issue of material fact as to the value Carob Bean provided under Section 548(c) and, accordingly, the extent, if any, that it properly may retain the down payment.  Accordingly, Carob Bean is not entitled to the affirmative defense under Section 548(c)

---

[82]

*See In re Positive Health Mgmt.*, 769 F.3d 899, 907 (5th Cir. 2014) (concluding that "value" under Section 548(c) is not the same as "reasonably equivalent value" under Section 548(a)).  Courts have come to different conclusions about the meaning of "value" in Section 548(c).  *Compare In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) ("The three terms—'reasonably equivalent value' in Section 548(a)(1)(b), 'fair consideration' in the D & CL and 'value' in Section 548(c)—have the same fundamental meaning."), *with In re Nat'l Audit Def. Network*, 367 B.R. 207, 223 (Bankr. D. Nev. 2007).

[83]

*Id*. at 908-09 (emphasis added).  NYDCL 278(1), on the other hand, requires "fair consideration."  NY Debt & Cred L § 278 (2019).

The Fifth Circuit concluded also that "value" under Section 548(c) is assessed from the perspective of the transferee.  *See In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002) ("[Section 548(c)] looks at value from the perspective of the transferee: How much did the transferee 'give'?  The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain.").

[84]

*Id*. at 906.

[85]

*Id*. at 907.

as a matter of law.

### *Conclusion*

For the foregoing reasons, the Bankruptcy Court's order is (1) vacated to the extent it granted Carob Bean's cross-motion for summary judgment dismissing the Complaint, and (2) affirmed to the extent it denied the Trustee's motion for summary judgment.  The case is remanded for further proceedings consistent with this decision.

SO ORDERED.

Dated:        April 24, 2025

_____
Lewis A. Kaplan
United States District Judge